IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PATRICK WAYNE BARRETT, SR.,

      Plaintiff,

v.

SENECA FOODS,

      Defendant.

OPINION and ORDER

Case No. 16-cv-211-wmc

---

*Pro se* plaintiff Patrick Wayne Barrett, Sr. worked for defendant Seneca Foods in Janesville, Wisconsin, for approximately two months in the fall of 2015 until his reincarceration for violations of the conditions of his supervision. Barrett subsequently filed this lawsuit against defendant Seneca Foods claiming violations of the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964. In particular, plaintiff claims that: (1) Seneca discriminated against him due to his learning disability in his position as a seasonal forklift driver and by refusing to promote him to a permanent position after he failed to pass a math test; (2) his coworkers at Seneca sexually harassed him based on their perception that he is homosexual; and (3) Seneca retaliated against him for complaining by refusing to let him retake the math test he failed. Now before the court is Seneca's motion for summary judgment. (Dkt. #82.) Since the undisputed evidence of record would not permit a reasonable juror to find in Barrett's favor, that motion will be granted and judgment will be entered in Seneca's favor.[1]

---

[1] The court reaches this conclusion even considering Barrett's requests for assistance in recruiting counsel and his unsuccessful discovery motions. Indeed, while Barrett filed multiple motions seeking documents about his medical records and other Seneca employees, and Magistrate Judge Crocker denied the majority of his requests, Judge Crocker also gave Barrett advise about how to

1

## I.   Seneca's Janesville Facility

Seneca owns and operates numerous facilities that process canned and frozen fruits and vegetables throughout the United States.   The Janesville facility employs approximately 250 year-round employees, and it hires more than 200 additional seasonal employees during the vegetable harvesting season.   The seasonal employees help with processing and packaging of perishable vegetables during that season, which typically spans from the second week of June, through mid-October or early November.

Seneca's Janesville facility contains warehouse and production departments, each of which has a department manager.   During the relevant time period, Steve Wallis was the warehouse manager; Pete Severson was an assistant warehouse manager; Larry King was the production manager; Ellen Murphy was a personnel clerk in the Janesville facility's human resources department; and James Uttech was Seneca's Vice President of Human Resources.

Employees at the Janesville facility working in production, warehouse and maintenance are represented by the United Food and Commercial Workers Union ("UFCW").   The terms of their employment are addressed in a Collective Bargaining

---

obtain the documents he was seeking and granted his one request for a subpoena related to his medical records.   Furthermore, Barrett's filings indicate that he has been able to recruit family members to help him gather evidence throughout the course of this lawsuit (dkt. #50), that he was actively engaged in the discovery process, and that he has been able to articulate legal and factual arguments in support of his claims (dkt. #90).

[2] Unless the court indicates otherwise, the following facts are material and undisputed when viewed in a light most favorable to plaintiff.   The court has drawn these facts from defendant's proposed findings of fact, plaintiff's responses to those proposed findings of fact, and the cited evidence of record.

Agreement between Seneca and the UFCW (the "CBA"), which among other things governs how Seneca selects employees for promotions and requires Seneca to advise employees of full-time positions it intends to fill by posting notices within the facility.

Seneca's Janesville facility employs a category of employees designated "group leaders."  Group leaders are non-management, union members with no supervisory authority, but with authority to direct other, non-management employees and to report workplace violations to management employees (such as warehouse manager Wallis, assistant manager King or produce manager Severson).  If a group leader observes an employee engaging in inappropriate conduct, a leader may redirect the employee or report the conduct to management.  When Barrett was employed at Seneca, Andy Terry was a union member who worked as a group leader.

## II.   Barrett's Background

Barrett, who identifies as bisexual, worked at the Janesville facility from September 15, 2015, until November 17, 2015.  Before Barrett started working there, he had been convicted of bank robbery in the Western District of Wisconsin, and sentenced to 188 months to be followed by three years of supervision.  *United States v. Barrett*, 02-cr-101-bbc (W.D. WI).  In addition, Barrett has a long history of mental health issues, substance abuse, addiction and only limited periods of sobriety when not incarcerated.  According to Barrett, he also suffers from a learning disability, but he does not provide specific information about his disability.  While Barrett further claims that he previously received social security benefits for a mental disability, he does not claim this disability was related to his claimed learning disability.

Barrett proffered one piece of hearsay evidence that may bear on his ability to learn: a 2003 presentence investigation report ("PSR") related to a previous criminal sentence. (Dkt. #83-1, 22-23.)[3] In it, the probation officer wrote that Barrett underwent brain surgery to remove a benign tumor as a child, and his mother recalls his behavioral issues to have begun after that procedure. The report also noted that Barrett "had problems learning and was enrolled in a special education curriculum," had been diagnosed in 2002 with bipolar disorder and antisocial personality disorder, and had a moderate cognitive impairment based on an IQ score of 64. However, the report did not provide specific details about the nature of his learning impairment. While Barrett failed to complete high school, it was because of truancy, and when he was incarcerated by the State of Illinois, he received his high school equivalency diploma.

Despite challenges, Barrett admitted in his deposition that he has continued to learn and educate himself, and he describes himself as being able to learn using a hands-on approach. As evidence of that, while he was incarcerated, Barrett has taken a variety of classes, including Spanish, vocabulary building, effective communication, parenting, typing, basic real estate, small business, graphic arts, creative writing, cognitive thinking and commercial driving.

---

[3] Barrett also maintains that his learning disability is reflected in the record of his treatment at "Remedies," a substance abuse program in which he participated in 2016 after his release from federal prison. (*See* Barrett Dep. (dkt. #83) at 22.) While the records of Barrett's treatment with Remedies includes a history of his psychological problems and physical health challenges, there is no mention that he reported a learning disability or demonstrated problems learning there. (Ex. 2 (dkt. #83-2).)

### III. Barrett's Employment At Seneca

#### A. Hiring

As mentioned, Barrett worked at Seneca for about two months, from September 15, 2015, to November 16, 2015. During Barrett's application process, he worked with personnel clerk Murphy, explaining that he struggles learning and would need help completing some forms. Barrett also told Murphy that he did not know how to operate a forklift. In response, Murphy assured him in general terms that Seneca staff would help him and teach him how to operate the forklift. Indeed, according to Seneca, Barrett learned to operate a forklift in one day or less, which was the average amount of time Seneca spends training new employees. While Barrett claims that he did not learn that quickly, he also acknowledged in his deposition that assistant warehouse manager Severson spent "several hours" training him, and he learned the basics of the job during that time period. (Barrett Dep. (dkt. #83) at 55.)[4] Regardless, Barrett was hired on September 15, 2015, and received his certification to operate a forklift.

On the same day Seneca hired Barrett, it received an informational letter from Rock Valley Community Programs, Inc. ("RVCP"), a residential re-entry program that assists offenders transitioning from prison back into the community. The letter stated that Barrett

---

[4] Barrett cites to an unauthenticated document entitled "Forklift Operator Safety Evaluation" to dispute whether he was trained over the course of several hours, but this document does not create a genuine dispute. It is dated September 16, 2015, and lists Barrett as the operator and Severson as the evaluator. It consists of an 18-item checklist for proper forklift operation that Barrett represents Severson filled out. The checked items on the document suggest that Severson determined that Barrett completed 17 out of the 18 items on the safety checklist, and the unchecked item included a comment that Barrett would "work with trainer to get better awareness of controls." While Barrett claims that this document shows he had not been properly trained on forklift operation, it does not create a genuine dispute as to Seneca's proposed fact that Barrett learned the *basics* of forklift operation on September 16, 2015, and received his certification.

was residing at the Rock Valley Alternative Program, was a convicted Class C felon, and would be completing his program at the facility in June of 2016.  The letter also included a request that Seneca report Barrett's absences, if any, to RVCP.  This letter had no bearing on Barrett's hiring.  In fact, it was not unusual for Seneca to receive a letter of this nature, as it frequently employs individuals in transitional programs similar to Barrett's.[5]  Therefore, when Seneca received the September 15, 2015, it was simply stored in Barrett's personnel file and kept confidential from non-HR and non-management personnel.

### B. Barrett's training and application for a full-time position

While hired as a seasonal warehouse forklift operator at the Janesville facility, less than one week after Barrett was hired, he bid on one of four full-time forklift operator positions on September 21, 2015, after Severson recommended that he apply.  However, Barrett was not ultimately considered for that position because he failed Seneca's "Basic Math and English Skills," a screening test Seneca administers to all full-time forklift operator applicants.

Seneca explains that the responsibilities of a seasonal forklift driver differ from the responsibilities of a full-time forklift driver.  While full-time forklift drivers are required to make mathematical calculations relating to product movement, storage and packaging, seasonable drivers do not make those calculations.  For that reason, the screening test asks ten short math problems related to the job functions of a full-time forklift operator.  Applicants taking the screening are allowed to use a calculator, and Seneca permits

---

[5] For example, during the 2015 seasonal processing system, Seneca employed 10 other individuals from RVCP who had criminal records.  Eventually, Seneca hired three of those individuals as full-time employees consistent with the CBA's job bidding process.

applicants who fail the screening to retake it when they apply for the next position posted under the CBA.

When Barrett took the screening, he was allowed to use a calculator, but failed. At that point, Seneca employees encouraged Barrett to brush up on his math skills and not give up. In addition, Barrett acknowledges that the warehouse manager, Wallis, told Barrett personally to let him know when he was ready to retake the test, indicating that he would let him do so. However, while Barrett does not provide details about when he asked for a retake or who he asked about it, but he insists that he did not get the chance to retake the screening for those specific job postings. Seneca eventually awarded the full-time forklift positions to other employees with greater qualifications, skills, abilities and seniority than Barrett.

### C. Alleged harassment and retaliation

Barrett continued working at Seneca without incident until around October 17, 2015, when Seneca received a complaint from a female employee about Barrett. She alleged that Barrett had been making inappropriate comments toward her. Seneca employees Matt Graf and Don Burke met with Barrett to discuss her complaint, and Barrett denied any wrongdoing, stating that "he loves his job and would never jeopardize his job with that kind of talk." (Barrett Dep. (dkt. #83) at 60.)

Terry, group leader, worked in the same area as Barrett during all but the last two weeks of his employment at Seneca and, it is undisputed, did not get along with Barrett, although the two describe their relationship differently. According to Barrett, Terry frequently confronted him and would exchange angry words with him. While their

exchanges never resulted in a physical altercation, Barrett reported feeling physically intimated by Terry. Additionally, Barrett claims that Terry monitored and berated him when he took bathroom breaks. In contrast, Terry acknowledges raising his voice with Barrett, explains this away by noting that employees in the plant setting need to raise their voices. Regardless, before the October 17 complaint by a female employee, Terry's exchanges with Barrett may not have been friendly, but the evidence of record does not indicate that any of Terry's comments were sexual in nature nor disparaging references to homosexuals. Still, Barrett claims that *after* the October 17 complaint, Terry started making comments that *were* sexual in nature.

While Barrett does not provide any specific dates for those comments, he avers that on one occasion Terry commented that "13 years is a long time to go without sex," and he asked Barrett if it was true that men had sex with one another in prison. (First Am. Compl. (dkt. #11) ¶¶ 33-34.) On other occasions, Barrett reports overhearing Terry say that it was "disgusting" that it had become "legal for queers to be married." Hearing this, led Barrett to ask Terry whether he was directing those comments to him; apparently this led Terry to call him a "faggot." (*Id.* ¶ 34.) Again, Barrett does not remember exactly when Terry made these comments, but he avers that Terry made comments of that nature about every other day.

Barrett further claims that he told assistant manager Severson about Terry's harassment, but Severson merely shrugged and said "that's just Andy." Severson denies that Barrett ever complained that Terry made comments about homosexuals, nor that Barrett reported that Terry called him a faggot. (Severson Aff. (dkt. #80) ¶ 6.)

On November 3, 2015, a male employee also claimed that Barrett made physical threats against him. As warehouse manager, Wallis separated Barrett from that employee and instructed both of them to contact him if any more problems arose. The next morning, Barrett was operating a forklift and two accidents occurred. First, Barrett was lifting divider sheets on a pallet with his forklift. When the sheets slid off the pallet, they struck and injured another employee. Second, Barrett backed into a support pole with the forklift. These incidents led to another heated exchange between Barrett and Terry. While Terry describes what he did as "redirecting" Barrett, Barrett claims that Terry yelled profanities into his face, called him names and approached Barrett aggressively. Specifically, Barrett claims that Terry came up to him and yelled, "What the fuck? Are you a fucking retard? Come on, man. You've gotta do better than this." (Barret Dep. (#83) at 95.) Apparently during this exchange Terry also called him a "faggot," using both an aggressive tone and body language. (Barrett Aff. (dkt. #12) ¶ 5.)

Afterwards, Barrett went to human resources and told Murphy that he wanted to quit. Barrett and Murphy both agree that he reported Terry was speaking harshly to and criticizing him, and at the time, he felt overwhelmed by the work in the warehouse. At least according to Barrett, he also reported Terry's past comments about homosexuals, although Murphy denies that Barrett complained about Terry making statements about homosexuals or using epithets to identify homosexuals. (Murphy Aff. (dkt. #77) ¶ 12.) Regardless of what Barrett actually said, however, it is undisputed that Murphy referred him to one of her superiors, although it is unclear exactly *who* Barrett met with next. Seneca indicates that it was likely Seneca's Vice President of Human Resources, Uttech, who avers

that he met with Barrett, and he persuaded Barrett to stay at Seneca, but to move far away from Terry, to the production area of the plant. While Barrett insists he never spoke to Uttech, and that he actually spoke with production manager King. In the end, however, Barrett does *not* dispute that he had a conversation with *a* management-level Seneca employee and agreed to a transfer to the production area.

On November 5, 2015, Barrett began working in the production area. He was assigned to the same shift and earned the same wage in the production facility as he had earned in the warehouse area. In the production area, Barrett did not have any subsequent interactions with Terry. Nonetheless, Barrett disliked his new position: he worked as a vegetable sweeper and much preferred the forklift job. While Barrett believes that Wallis told King of his complaints about Terry's harassment, and that is why he became a vegetable sweeper, Barrett does not cite any evidence beyond his own statements that he *believed* Wallis told King.

Finally, on November 17, 2015, Barrett's case manager at RVCP notified Seneca that Barrett was no longer available for work because he had consumed alcohol in violation of his conditions of release and re-incarcerated.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In resolving defendant's motion, the court draws all reasonable inferences in the nonmoving party's favor.  *Ozlowski v. Henderson*, 237 F.3d 837, 839 (7th Cir. 2001) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).  To avoid summary judgment, plaintiff must submit more than a scintilla of evidence that would permit a reasonable jury to find in his favor.  *Nowak v. St. Rita High School*, 142 F.3d 999, 1002 (7th Cir. 1998).  Defendant seeks judgment on all of plaintiff's claims. Accordingly, the court will address them in turn.

## I.     Americans With Disabilities Act

The ADA prohibits employers from discriminating against qualified employees with disabilities.  42 U.S.C. § 12112(a).  The definition of "discriminate" in the act is broad, and it includes discrimination in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.  *Id.*   In order to prove disability discrimination under the ADA, however, plaintiff must at least prove that (a) he is disabled within the meaning of the ADA; (b) he is qualified to perform the essential functions of the job; and (c) he suffered from an adverse employment action because of his disability.  *Nese v. Julian Nordic Construction Co.*, 405 F.3d 638, 641 (7th Cir. 2005).  Unfortunately for plaintiff, his proof fails with respect to all three elements under the ADA.

### A. Disability

At least defined by the ADA, the evidence of record would not permit a reasonable jury to find that Barrett is disabled.  To prove a disability under the ADA, plaintiff must establish that (1) he has a physical or mental impairment that substantially limits one or

11

more major life activities; (2) he has a record of such an impairment; or (3) his employer regards him as having such an impairment. *Fredricksen v. UPS, Inc.*, 581 F.3d 516, 521 (7th Cir. 2009) (citing 42 U.S.C. § 12102(2)). Under the ADA, a mental impairment is "[a]ny mental or psychological disorder, such as an intellectual disability . . . organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). While the court will accept that there remains a question regarding whether plaintiff's learning disability may qualify as a "mental impairment" under the ADA, a reasonable fact finder could not conclude on this record that his disability substantially limits any major life activity.

As a starting point, Barrett's description of his learning disability is too vague to meet the ADA's definition. He claims: "Plaintiff's definition of his disorder is quite simple; I 'hear' and I forget, I 'see' and I remember, I 'Do' and I understand." (Pl. Br. (dkt. #90) at 2.) Even putting aside the obvious hearsay problems with Barrett's 2003 PSR, it only provides more information; it did not report a *specific* learning disability. At most, it bolsters Barrett's report of a history of taking special education classes, as well as a "moderate cognitive impairment." Seneca does not dispute the veracity of this report, and instead takes issue with the fact that Barrett does not specify a *type* of learning disability. In construing these statements in the light most favorable to Barrett, however, the statements in the PSR might preclude the court from concluding as a matter of law that Barrett does *not* suffer from a learning impairment as defined by the ADA.

Still, it would be unreasonable on this meager record for a reasonable trier of fact to find that Barrett's learning disability substantially limited his ability to work as a forklift

driver while he worked at Seneca. To begin, Barrett's personal assertion that he is disabled cannot support that conclusion because "[t]o survive summary judgment, the plaintiff must provide specific facts establishing that there is a genuine issue of material facts as to whether he is substantially limited in a major life activity." *See Scheerer v. Potter*, 443 F.3d 916, 919 (7th Cir. 2006) ("Specific facts are required; conclusory allegations will not do."). Nor can Barrett's previous receipt of social security benefits suffice, since he received those benefits as a result of findings related to his depression and bipolar disorder, which are not linked to his learning disability.[6] More importantly, Barrett provides no specific metric suggesting that his learning disability severely restricts his ability to function in day-to-day life, much less in working at Seneca. In fact, Barrett's own statements contradict his position. Specifically, Barrett: (1) argues in his brief that Severson recognized his "hard work, reliability, attendance and dependability," (2) testified during his deposition that he was able to learn the basic steps of forklift operations after spending just a few hours with Severson, and (3) took several classes while incarcerated, using a "hands on" approach to learning. Perhaps most telling, Barrett can point to no specific limitation he faced to succeed in his work at Seneca. Specifically, the undisputed record shows Seneca hired him for the position, found his work acceptable and allowed him to work until Barrett

---

[6] Additionally, Barrett also now argues that beyond his learning disability, various physical ailments rendered him disabled under the ADA. For example, he claims to suffer from an enlarged prostate and sleep apnea, and that Seneca discriminated against him because these ailments caused him to urinate more frequently and lose sleep. However, these issues are not properly before the court: the court permitted Barrett to proceed on an ADA claim related to his *learning disability* only, and he has not sought to amend his complaint to include additional claims related to how Seneca employees responded to his physical ailments. Accordingly, the court has evaluated only the arguments and evidence related to Barrett's learning disability.

effectually self-terminated by violating the terms of his supervised release and being returned to prison.

Even failing his math screening had no obvious negative impact as a result of a disability. First, only conjecture could link his failure to his amorphous learning disability. Second, the failure only delayed his eligibility for permanent work, since it is undisputed that he could have asked to be screened again, and only his leaving the job prevented this. Third, whether his job was temporary or permanent, Barrett's revocation ended his employment, not any arguable learning disability. Based on these admissions, there is *no* factual basis for a reasonable juror to find that Barrett's learning disability has prevented him from functioning well on a day-to-day basis.

Although the facts and outcome were different, defendant's citation to *Emerson v. N. States Power Co.*, 256 F.3d 506, 511-12 (7th Cir. 2001), is instructive. In *Emerson*, the plaintiff provided several pieces of evidence tying her performance issues to her learning disability. For example, she had submitted evidence that she had difficulty learning a new telephone and computer systems, and she also frustrated her supervisors by asking repetitive questions when she could not remember the answers. *Id.* Barrett's experience at Seneca was quite different: with some assistance, he was able to fill out the necessary paperwork to work at Seneca; he successfully learned the basics of forklift operation; and he drove the forklift for over a month before the November 4, 2015, accidents. The problems that Barrett reported had to do with how Terry treated him, apparently mainly for reasons unrelated to any learning disability he may or may not have had.

Finally, Barrett has submitted no evidence that anyone at Seneca regarded him as having a learning disability. Although Barrett claims that he told Murphy about his problems learning, there is no suggestion that Barrett gave Murphy any details about his trouble learning that would have given her reason to know that his learning impairment actually limits major life activities. Moreover, there is no evidence that whatever Barrett relayed to Murphy ever made it to those Seneca employees responsible for managing, training or directing Barrett on the job. To the contrary, the only evidence is that this information never left Seneca's HR department. Regardless, Barrett's general statement that he had trouble learning is insufficient evidence to have put Seneca on notice of his learning disability, and, in any event, Seneca did not believe that he was disabled. *Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 (7th Cir. 2011) (plaintiff bears the burden of showing that employer believed plaintiff to be substantially limited in his ability to learn). Accordingly, Barrett's ADA claim fails at the first prong because the evidence would not permit a reasonable jury to conclude that he is disabled, as defined by the ADA.

## B.     Qualified individual

Barrett's ADA claim also fails because a reasonable fact-finder could not conclude on this record that plaintiff was qualified for a full-time forklift position. To determine whether an employee is a "qualified individual," the court first considers whether the individual satisfies the prerequisites for the position and then evaluates whether the individual can perform the essential functions of the job with or without reasonable accommodation. *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241-42 (7th Cir. 2018) (citing *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015). Prerequisites

for a job can include appropriate educational background, employment experiences, skills and license. *Id.*; *Budde v. Kane County Forest Preserve*, 597 F.3d 860, 862 (7th Cir. 2010). Employers are entitled to define the core qualifications for a position, which can include passing an examination. *Budde*, 597 F.3d at 862.

Barrett does not dispute that he failed the screening test, and he has submitted no evidence that the screening test did not adequately capture the mathematical requirements of the full-time forklift position. Rather, Barrett claims that he requested an accommodation when he asked to retake the screening test after he had another chance to study, but this argument fails as well. To prevail on a failure to accommodate claim, plaintiff must show that he was a qualified individual with a disability, and that defendant was aware of his disability but failed to reasonably accommodate it. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014). To start, the court did not grant plaintiff leave to proceed on an accommodation claim, nor did Barrett request to amend his complaint to include such a claim. Setting aside that hurdle, and assuming that Barrett had submitted evidence that he *was* qualified because he could have passed the screening test if he received an accommodation, it would be unreasonable to conclude that Seneca failed to reasonably accommodate his disability on this record.

First, Barrett never told any Seneca employee that he suffers from a specific learning disability that would require accommodation. As previously discussed, he avers to telling Murphy that he had "a hard time learning" and asked for help filling out computer paperwork, but Barrett has submitted no evidence that would permit an inference that he told Murphy (or anyone else) of his need for help in a broader sense. To the contrary,

Barrett insists that warehouse manager Wallis actually told him that he could retake the test the next day, but that his subsequent request to retake the test was refused. Aside from the fact that Barrett provides no detail as to who (or why he was) refused, or whether he followed up with Wallis, Barrett provides *no* evidence that Wallis or anyone else refused plaintiff's request to a re-take *because of* his learning disability. Rather, on this record, it appears that Wallis was simply encouraging Barrett to study hard and to try again in response to Barrett's disappointment that he failed the test.[7]

### C.    Causation

To the extent there is even an argument as to Barrett's failure to establish his claimed disability or qualifications for the job, he has not submitted sufficient evidence to avoid judgment on the issue of causation. While historically a plaintiff must prove discrimination using the direct and/or indirect method of proof, the Seventh Circuit has moved away from a rigid application of these multifactored tests. *Monroe v. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (quoting *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Rather, this court is obligated to "decide, when considering the evidence as a whole, 'whether the evidence would permit a reasonable factfinder to conclude that plaintiff's [disability] caused the discharge or other adverse employment action." *Id.* That

---

[7] Seneca also argues that the November 4, 2015, accidents illustrate that he was ill-equipped for the full-time forklift position, although it cites no authority for the proposition that those mistakes automatically disqualified him from that position. Furthermore, Barrett claims that he "adapted and excelled at his job," which would create a dispute of fact related to whether Barrett's actual performance as a forklift driver disqualified him for the full-time position. Importantly, however, there is *no* basis to find that Barrett's issues with *operating* a forklift had anything to do with his claimed disability. Moreover, since Barrett has failed to offer evidence to dispute Seneca's need for the screening for the full-time position, nor dispute that he never requested an accommodation for his learning disability, a reasonable juror could not conclude that he was qualified for the position.

said, Barrett's arguments allude to the indirect method of proving his claim, which requires the plaintiff to make the following prima facie showing: (1) membership in a protected class; (2) meeting the employer's legitimate expectations; (3) an adverse employment action; and (4) different treatment than a similarly situated, non-disabled employee. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014). While the court ultimately concluded that plaintiff cannot prove causation based on all of the evidence of record, the court will specifically address his arguments.

Barrett argues that he was treated differently than other "similarly situated" employees because Seneca hired other individuals from the RVCP. This argument is meritless, since there is no evidence that other, non-disabled individuals, whether RVC residents or not, were hired as full-time forklift drivers even though he or she did not pass the screening test. *See Raymond v. Ameritech*, 442 F.3d 600, 610-11 (7th Cir. 2000) (citing *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) ("It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-[disabled] employees, the plaintiff must show that the 'comparables' are similarly situated in *all respects*."). Furthermore, the record shows the individuals Seneca hired for the full-time forklift positions were more senior to Barrett. Given that seniority is one of the objective factors the CBA deems relevant for hiring purposes -- and is actually the tie-breaker when the other merits-based factors are a wash -- it would be unreasonable to conclude that anyone at Seneca discriminated against Barrett because of his learning disability when they hired more senior workers. Accordingly, judgment in Seneca's favor is appropriate on Barrett's ADA claim.

## II.    Harassment and retaliation

Seneca also requests judgment on Barrett's sexual harassment and retaliation claims. The court granted Barrett leave to proceed on these claims under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e - 2000e-17.  *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000); 42 U.S.C. § 2000e–3(a) (Title VII also "protects persons not just from certain forms of job discrimination [and harassment], but from retaliation for complaining about the types of discrimination it prohibits.").  Here, too, his proof fails short at summary judgment.

### A.  Harassment

Title VII prohibits employers from harassing employees "because of [their] sex." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78–79 (1998); 42 U.S.C. § 2000e–2(a)(1).  Recently, the Court of Appeals for Seventh Circuit held that the statute prohibits sexual orientation discrimination as well.  *Hively v. Ivy Tech Community College of Indiana*, 853 F.3d 339 (7th Cir. 2017).

To prove sexual harassment under Title VII, a plaintiff must demonstrate that:  (1) he experienced unwelcome harassment; (2) the harassment was based on sex (in this case, sexual orientation); (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abuse environment; and (4) a basis for employer liability exists.  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007).  Seneca argues that summary judgment is appropriate because Barrett has not submitted sufficient evidence from which a reasonable jury could find that Terry's

harassment was severe or pervasive, or find a basis for employer liability.[8]  Both arguments

have merit.

*First*, to show severe or pervasive harassment constituting a hostile work

environment, the conduct must be both objectively and subjectively offensive.  *Boumehdi*,

489 F.3d at 788.  Defendant concedes for purposes of summary judgment that plaintiff

was subjectively offended by Terry's comments.  To determine whether harassment is

objectively offensive, however, courts consider "the frequency of the conduct; its severity;

whether it was physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interfered with the alleged victim's work performance."  *Id.* at 788

(citing *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir. 2000)).  Here, the

problem with plaintiff's claim is its lack of detail:  with one exception addressed below, he

---

[8] Besides seeking judgment on the merits of plaintiff's claim, Seneca argues judgment is appropriate because his claim hinges on Seneca's perception about his sexual orientation, but Title VII does not protect perceived membership in a protected class.  As the argument goes, since Seneca did not believe that Barrett was homosexual or bisexual, it cannot be held liable for sexual harassment.  This argument misses the mark since some of Terry's purportedly harassing statements related directly to Barrett's sexual orientation.  Even assuming that Terry did not know Barrett's sexual orientation when he made the comments, the fact remains that Terry's comments were demeaning towards individuals who are sexually attracted to individuals of the same sex.  Seneca's citation to inapposite cases -- in which the defendants' comments were made based on an *incorrect* perception that the Barrett was a member of the protected class -- highlights its internally inconsistent argument.  *See Adler v. Evanston Northwestern Healthcare Corp.*, No. 07-c-4203, 2008 WL 5272455, at *4 (N.D. Ill. Dec. 16, 2008); *Sears v. Jo-Ann Stores, Inc.*, No. 3:12-1322, 2014 WL 1664058, at *8 (M.D. Tenn. Apr. 25, 2014); *Yousif v. Landers McClarty Olathe KS, LLC*, No. 12-2788-CM, 2013 WL 5819703, at *3 (D. Kan. Oct. 28, 2013); *Guthrey v. Cal. Dep't of Corr. & Rehab*, No. 1:10-cv-02177-AWI-BAM, 2012 WL 2499938, at *6 (E.D. Cal. June 27, 2012); *Burrage v. FedEx Freight, Inc.*, No. 4:10-cv-2755, 2012 WL 1068794, at *5 (N.D. Ohio Mar. 29, 2012); *El v. Max Daetwyler Corp.*, No. 3:09-cv-415, 2011 WL 1769805, at *5 (W.D.N.C. May 9, 2011); *Lewis v. N. Gen. Hosp.*, 502 F. Supp. 2d 390, 41 (S.D.N.Y. 2007); *Butler v. Potter*, 345 F. Supp. 2d 844, 850 (E.D. Tenn. 2004); *Lopez-Galvan v. Mens Warehouse*, No. 3:06-cv-537, 2008 WL 2705604, at *7 (W.D.N.C. July 10, 2008); *Uddin v. Universal Avionics Sys. Corp.*, No. 1:05-cv-1115, 2006 WL 1835291, at *6 (N.D. Ga. June 30, 2006).

provides no specifics about when Terry made sexually harassing comments, how many times, and what the surrounding context was. Moreover, there is *no* dispute Terry's comments covered a short period of time and were not a constant barrage.

Generously following Barrett's timeline, Terry started asking questions about sex in prison and commenting about homosexuals after the October 17 complaint lodged against Barrett, and Barrett moved to the production area about two weeks later, on November 5. This means that Barrett endured Terry's comments for at most slightly more than two weeks. While this short period of time alone is not dispositive, Barrett further represents that Terry made comments to him every other day, suggesting that his comments occurred, at most, on less than ten occasions. Similarly, Barrett's description of his interactions with Terry do not suggest that he was threatened with physical harm. Even though Barrett claims that he believed that his interactions with Terry *could* have ended in a fight, Terry never actually made contact with Barrett, nor did he ever threaten to hurt him. Without minimizing the hurt caused by Terry's claimed comments, that frequency, paired with the fact that the description of the comments are somewhat vague, both as to the terms used or overheard, does not rise to the level of sexual harassment.

Viewing Terry's behavior as a whole, his apparent habit of monitoring Barrett's bathroom breaks, yelling at him, and making derogatory comments about homosexuals was by any account insensitive and rude, but "[t]he 'occasional vulgar banter, tinged with sexual innuendo . . . or boorish workers' generally does not create a work environment that a reasonable person would find intolerable." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007) (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.

1995)).  Indeed, it is well-recognized that Title VII does not authorize this court to enforce a "general civility code" in the workplace.  *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81, 118 S. Ct. 998 (1998).   In the end, Barrett's experiences are best analogized to circumstances in which the Seventh Circuit agreed that plaintiff failed to demonstrate harassing conduct.  *See Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (plaintiff's complaints of eight gender-related comments during the course of her employment was insufficient to demonstrate a hostile work environment); *Adusumilli v. City of Chi.*, 164 F.3d 353, 361-62 (7th Cir. 1998) (plaintiff's complaints of teasing; ambiguous comments about bananas, rubber bands, and low neck tops; staring; and four isolated incidents of touching did not constitute sexual harassment).  *See also Hilt-Dyson v. City of Chi.*,282, F.3d 456, 463-64 (7th Cir. 2002) (plaintiff's allegations that a supervisor rubbed her back, squeezed her shoulder and stared at her chest during a uniform inspection were isolated incidents, and even when taken together, did not create a sufficient inference of a hostile work environment).

That said, Barrett's heated exchange with Terry on November 4, 2015, requires a separate discussion, since a single incident can give rise to an actionable Title VII claim if extraordinarily severe.  *See EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 433 (7th Cir. 2012).   Specifically, after Barrett's two accidents with a forklift in one day, Terry purportedly yelled at him "What the fuck?  Are you a fucking retard?  Come on, man.  You've gotta do better than this."  (Barrett Dep. (dkt. #83), at 95.)  While the details are unclear, at some point during this exchange, Barrett also claims Terry called him a faggot and was standing very close to him.  As disturbing as this incident may have been for

Barrett, context matters in evaluating whether Terry's outburst was objectively severe. Barrett and Terry were working in a warehouse, where it was not out of the norm for workers to use loud voices simply to be heard over ambient noise. Additionally, this exchange did not come out of the blue, and instead immediately followed an accident where another employee was injured. While his language may have been overly harsh, Terry's comments were directly related to Barrett's work performance.

Furthermore, Terry's outburst was markedly less severe than other circumstances in which isolated acts of harassment have constituted actionable harassment. *See Mgmt. Hosp. of Racine, Inc.*, 666 F.3d at 432 (supervisor severely harassed an employee when he stated he wanted to "fuck her," she was "kinky" and liked "rough sex," and physically groped her buttocks); *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999) (single incident of injuring employee's wrist due to her gender constituted severe harassment); *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008) (sexual assault constitutes severe harassment). To be sure, Terry's use of the word "faggot" was inappropriate and offensive, but Barrett does not claim that Terry dispensed the name-calling along with any sort of physical contact or verbal threat. Again, while Barrett claims that he believed Terry's body language to be threatening, he does not provide any details about his body language or how close Terry was to him when he was yelling. On this record, therefore, it would be unreasonable for a jury to conclude that Terry's behavior on November 4th, alone, amounted to sexual harassment under Title VII.

*Second*, Seneca cannot be held liable for Terry's conduct in any event, because there is no dispute that Seneca took prompt steps to move Barrett away from Terry after he

complained about this harassment. Employers are held strictly liable in circumstances in which "the harassment takes the form, not here alleged, of an abuse of authority, as where a supervisor threatens to fire a subordinate if she refuses to have sex with him." *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 432 (7th Cir. 1995). When the harasser is a co-worker, however, the employer can assert an affirmative defense by showing that it: (1) "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities that the employer provides. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998) (employer may escape liability if it took reasonable care to prevent and promptly correct the offending behavior); *Silk v. City of Chi.,* 194 F.3d 788, 805 (7th Cir. 1999) (same).

As an initial matter, while Terry was a group leader, the undisputed evidence establishes that he had no authority to make decisions about Barrett's employment, and so Seneca is entitled to assert the affirmative defense that it responded promptly to correct Terry's behavior. Accordingly, the question becomes whether a reasonable jury could find that the timing of Seneca's response, as well as the decision to transfer Barrett to the production area, were reasonable under the circumstances.

With respect to the promptness of Seneca's response, while Barrett claims that he complained to the warehouse manager and assistant manager, Severson and Wallis, respectively, about Terry's sexual harassment in October, his only evidence -- his own statements -- are imprecise. While Barrett remembers telling Wallis that Terry had been "harassing," and "hounding" him, Barrett cannot not remember actually reporting any

*sexual* harassment. (Barrett Dep. *(dkt. #83)* at 70.) Barrett's assertions regarding what he told Wallis, which he acknowledges is based on his spotty memory of what he said and when he said it, are insufficient to dispute Wallis's statements that Barrett did not complain about Terry's sexual harassment. *Hammel v. Eau Galle Cheese Factory*, No. 02-c-405-c, 2003 WL 21067091, at *12 (W.D. Wis. Apr. 15, 2003) ("A statement of 'I don't recall,' suggests a 'mere possibility' of a dispute, which does not satisfy the requirements of Rule 56." (quoting *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983))). Accordingly, on this record, the court finds that there is no genuine dispute over whether Barrett informed Wallis about Terry's sexual harassment-type comments.

Severson is arguably a closer call, except that the evidence still does not suggest that Severson was in a position to take corrective action given the timing. Barrett believes he complained about Terry to Severson about Terry's "sexual harassment," but he provides no evidence as to what he told Severson, nor can he remember when he told Severson. The best Barrett could offer was that it was "sometime" in October, and Terry's sexual harassment did not even start until after October 16. (Barrett Dep. (dkt. #83) at 71-72.) Given that Barrett had various complaints about Terry's behavior, and not all of them involved sexual harassment, a reasonable jury would have difficulty concluding that Severson was ever in a position to take corrective action with respect to Terry's sexual harassment. That factual question need not be resolved, however, since Barrett does remember telling HR clerk Murphy about Terry's sexual harassment during their November 4, 2015, meeting. Given that Murphy agrees Barrett complained about Terry in that meeting, Barrett has submitted sufficient evidence to create more than a "mere

possibility" that he actually complained about Terry's sexual harassment.

Accepting that Barrett reported Terry's sexual harassment at least at that point, however, his claim still fails because the record shows Seneca responded in a manner that made it unlikely Barrett would have to deal with Terry's harassment again in the future. In evaluating whether an employer's response to reports of harassment pass muster, courts look are to consider whether the employer took "effective steps to physically separate employees and limit contact between them," thus making it "'distinctly improbable' that there will be future harassment." *Lapka*, 517 F.3d at 985. Here, Murphy promptly passed Barrett's complaints up the chain of command, and he agreed to move to the production area, where no subsequent interactions with Terry occurred. While Barrett complains that working in the production area was "less desirable" than his work as a forklift driver (and indeed, he interpreted the transfer as punishment), Barrett agreed to the transfer and specifically reported that working in the warehouse environment was too stressful for him. More to the point, there is no dispute his transfer made it "distinctly improbable" that Terry would be able to harass him in the future because, at least according to the evidence of record, the two never crossed paths again. Accordingly, even assuming that Terry's behavior amounted to sexual harassment, Seneca's response entitles it to judgment on this claim.

## B. Retaliation

Finally, Seneca moves for summary judgment on Barrett's claim that he was denied a full-time forklift position in retaliation for his complaint about Terry. To prevail on a claim of retaliation, the plaintiff must prove that he: (1) opposed an unlawful employment

practice under Title VII; (2) was the object of an adverse employment action; and (3) that the adverse employment action was caused by his opposition to the unlawful employment practice. *Cullom v. Brown*, 209 F.3d 1035, 1040 (7th Cir. 2000). On this record, a reasonable fact-finder could not conclude that plaintiff suffered any adverse employment action.

According to Barrett, Seneca retaliated against him for complaining about Terry by refusing to allow him to retake the screening test for the full-time forklift position. However, "not everything that makes an employee unhappy is an actionable adverse action.'" *Oest v. Ill. Dept. of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)) overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). "An adverse employment action must be materially adverse"; it must "significantly alter[] the terms and conditions of the employee's job." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (internal citations omitted). Even if Barrett may have wanted to retake the screening test to drive the forklift permanently, he has not put forth sufficient evidence to permit a reasonable jury to agree that his transfer or inability to retake the test actually altered the terms of his employment. Instead, Barrett was frustrated that he was not given the opportunity to retake the test, and he was moved to the production area after he complained to Murphy about Terry. However, his earnings did not change, and more generally, Barrett acknowledged that working in the warehouse was stressful.

Even if Barrett could establish that he suffered an adverse employment action by virtue of his "failed" effort to be considered for a promotion, his retaliation claim still fails

at the third prong.  Indeed, if Barrett took the test again and passed, Seneca had another objective reason not to hire him:  he was less senior than the individuals that were hired. As the court has already explained, Barrett has not submitted sufficient evidence for a reasonable juror to conclude that the hiring decision was based on anything other than the objective factors set forth by the CBA.  Moreover, since Barrett's move to a new department was the response to Barrett's own complaints about Terry's harassment, the transfer cannot be a basis for a retaliation claim.  *Cullan*, 207 F.3d at 1040 ("in order to prove causation the plaintiff must demonstrate that the employer would not have taken the adverse action but for the protected expression.") (citation omitted).  Accordingly, judgment in Seneca's favor is appropriate on Barrett's retaliation claim as well.

ORDER

IT IS ORDERED that:

1.    Defendant Seneca Foods' motion for summary judgment (dkt. #82) is GRANTED.

2.    The clerk of court is DIRECTED to enter judgment in defendant's favor and close this case.

Entered this 29th day of October, 2018.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge